Thank you, Your Honor. All right, we will proceed then to hear argument in the second case on calendar for argument today, which is 25-1521, James and Dina Hughes v. American Strategic Insurance Company. And we will hear first from Mr. Bragg. Good morning, Your Honors. May it please the Court, Doug Bragg, on behalf of James and Dina Hughes. I'd like to reserve about five minutes for rebuttal, if that's all right. So the case before the Court is a consumer protection law, the application of whether or not the insurance company, ASI, followed the state rules in Washington as far as getting consent, affirmative consent, to send electronic notices for renewal and then whether or not they followed that process. Counsel, before you get into your other arguments, could you just address whether we should treat Mr. and Mrs. Hughes differently? You should treat them differently, Your Honor, because the statute requires that the notice be sent to the named insured and not to the named insured's agent. The statute specifically says that the insurance company or its agent... So does that mean for electronic notice, they always have to have two emails? They can't have one email for both persons? I think that, Your Honor, the answer to that question is when they apply for the insurance, they can identify how each insured can be notified. And if the insureds say, yes, we use one email, then that's appropriate. But if they don't, then it's not. In this case, there's no evidence as to what was in that application of insurance. There's no evidence that ASI ever asked that question, like how do we reach Dena Hughes? Is there any case law construing the statute that suggests that electronic notification in the case of a married couple has to have two email addresses? The only thing I was able to find in Nichols v. Hughes, which talks about how in Washington, the courts have consistently held that the delegation of authority to manage community property does not cloak the managing spouse with authority to enter into a transaction that specifically requires the involvement of both parties. And since this statute specifically requires the involvement of both parties, namely the notification to each named insured, then this rule would seem to apply regardless of electronic or otherwise. When the Hughes obtained coverage, did both of them apply for it? Yes. But when the application was submitted, did Mr. Hughes just submit it, or was it submitted by both of them? I mean, did they sign? I don't know. Mr. Hughes stated in his declaration that he did it entirely over the phone, that he was the only one involved in that process, that they didn't ask to talk to her, and they didn't give him anything to sign. The ASI record shows that there was some sort of an electronic signature for the new business and then initials for specific um waivers of types of coverage like flood insurance, animal liability, renter liability, that's in the record. But that excerpt doesn't include a check the box or an initial or a signature for this electronic notice agreement that they had. It does seem a little bit incongruous that one person, Mr. Hughes, can get coverage, but then in terms of renewal notice, you're arguing that both of them have to. Your Honor, I don't know why ASI set it up this way and why they did not also require Dena Hughes to do so, or as RCW 48.185.005 talks about the failure to follow the appropriate procedures is not a basis for ASI to get out of offering coverage and providing as a named insured, and they elected to take on that coverage, I think is binding on them. So any other questions on Mrs. Hughes? So the primary focus of our argument was at the court, at the trial court level, was whether or not there was compliance with RCW 48.185.005 sub 4, which is a notice of, or a document may be delivered by an insurer to a party by electronic means under the statute section only if A, B, C, and D are complied with. A requires affirmative consent, and again, there's nothing in the record that shows that Mr. Hughes affirmatively consented. He said he did everything over the phone. There's a declaration from ASI, saying that, well, he must have logged in, but we don't have a login record. We've got a box that's produced at the file, but at ER 48, that box is in their briefing, and beneath it, it says that, well, if the insured puts in their password and clicks the button, they go to the next page to sign off. It doesn't say that they have to check the box. The check the box has other issues too, but there's Mr. Hughes testified in his deposition. He had no recollection of ever checking the box. He wasn't showed that information. Then we've got to have C, and this is where the trial court ignored section C, that the party before giving consent has been provided with a statement of the hardware and software requirements for access to and retention to notices and documents. The notice that ASI has provided references computers and emails. It doesn't say anything about PDFs, so right there, it doesn't include all the software that's required to access the notices that were sent. The next requirement, C2, says that the party consents electronically or confirms that consent electronically in a manner that reasonably demonstrates the party can access the information electronic form. So that required that Mr. Hughes, in accepting that electronic notice, has demonstrated he can access a PDF document, that he can review it in its entirety, but they did not do any of this using a PDF. They did not do any of this using email. It was all, according to them, on a website. It was, they showed one website that apparently had nothing on it except for the box saying, to complete your application, check the box, click the button, and then went on to the application that he allegedly did online. But is there any doubt that he could open a PDF file here? Your Honor, I think that he could eventually open a PDF at some point, but the problem here is the statute doesn't say that he can, that they can get around this by showing that he actually could at some future point. I think when they say to have access to a computer, I mean, much more detail than what the statute requires. In fact, if you do that, it'll probably confuse consumers more. If you say, well, you need Windows 11 with, you know, two gigabytes of memory, et cetera, et cetera, you're probably more likely to confuse rather than you have access to a computer. I'm not saying that they needed to have that degree of detail. I'm just saying that they needed to say you have to have access to a PDF reader, right? I mean, that right there is not in here, and that you have to be able to open and read a PDF. And oftentimes... Is there a computer that can't open a PDF file? I'm not aware of that. I had to download a PDF reader when I first got my most recent computer, so... I mean, I think Internet Explorers can, or now Edge, I mean, this is the thing now, you know, you require, well, you have to have Edge, you have to have Chrome, you have to have... And he did this on his phone. This is, yeah, and phones can open that as well. I mean, I think this is, you're reading it so finely to acquire every little detail, and you can go into granular detail, but it's to inform consumers whether they can open it. And here, it clearly seems like you concede he could have opened it. The point is that the requirement is here in the statute, and I understand the Court's point. I think that here that they needed to demonstrate that. The other issue we have with the notice is it has to be clear and conspicuous. The clarity of it is questionable, given that it says it applies to this transaction. It doesn't identify the documents that it's going to be related to in the future. And just saying all insurance documents, it's an insurance policy. That could be everything without any guidance whatsoever to the consumer. And what's the point of telling this, putting in the statute that they have to identify the types of notices and documents if the insurance company can just say everything? That doesn't tell anyone what they're going to expect, what everything entails. It's not clear as to that. And then the conspicuous issue is Berman, right, the Berman case. And the presentation of this notice is exactly like what was in Berman that the Berman Court said was insufficient. You've got the larger text up top. You've got the smaller grayed-out print with the blue text, but it's not capitals. It's not underlined as a hyperlink usually is. And then below that, you've got that button that says sign now and sign later in large print. And again, in their own manuals as they put into their briefing, they say that the user can actually go forward without clicking that box. And there's no evidence that he clicked that box. They didn't track that information in their own logs. If you go to, let me see if I can pull is the interior is the briefing. Yeah, here we go. ER 48, the briefing on it. So it looks like it's clearly taken out of someone's manual, training manual. And it says below it, when the insured enters their password information and click sign now, their application will be available to review followed by boxes to initial and sign. But looking at the terms and conditions that are attached to that, it says you understand that you must have a computer and access to email in order to conduct this transaction and future transactions electronically. Why isn't that sufficient in layman's terms to qualify as a statement of the hardware and software requirements? Because if you have email and a computer, it's going to open a PDF file because that's really in today's day and age, that's all you need. That's a layman's way of that's what you got to have. When you're saying that you're going to send it in email, then it's going to be in the body of the email. That's what you're looking at. It's not saying and you're going to have to open up these other PDFs and go through it. So in this particular case, he got an email that said policy information enclosed. He reads the email. The email says, you know, look at the first few pages if you owe any money. The first few pages are his address, a blank form, and the privacy information. So I wanted to ask you, you said in your brief on page 42, and this is going ahead to the consumer claim, the CPA claim, you said ASI's email communications to the Hughes' in July and August 2022. I assume that's a typo. That is a typo. I didn't see it. There's a July email and there's a September one and you quote the language and cite the date and they're July and September. The two emails in July are really the focus. You've got the July 15 email that says this is what you've got to do. Check with your mortgage company. See if you have to make a payment. Three days later, they send another email saying you don't have to take any action. So at that point, it's like they've clarified that he doesn't have to do anything. But then you also, I mean, you have the September email where they, it sounds, I mean, it's the same wording as the first July email and don't say a word about cancellation. Correct. And that was after the termination. So it was after it was all done anyway. So at that point, he may have thought, well, gee, they emailed me in July saying I don't have to do anything. Then the renewal period comes along and then the same email saying here's your policy information is enclosed. OK, well, that's consistent with a renewal. Move on with my life. And that's the CPA is that this is very misleading the way they set this up. They set him up to fail. Can you address that email? It's a progressive email, July email. And you look at it as misleading. I don't know whose fault it is, but your homeowner policy renewal period is starting soon because you paid through your mortgage lender. No action is needed. But it comes from Progressive. What's the connection? Everything was through Progressive. If you look at the first email, it's also from Progressive. And it's Progressive. I don't know if it's in the record. What's the connection between Progressive and ASI? ASI, my understanding is that they are an underwriter that that sells through Progressive. And according to the declaration that ASI had authorized Progressive to sell their policies and their communication to him, that first email on July 15 is from a Progressive email address. And the second one is from a Progressive email address. He called Progressive to get the policy. It's all through Progressive. It's all connected. I have two minutes left. So unless there's anything else, I guess I'll reserve the rest of my time. All right. Thank you, counsel. So we'll hear now from Mr. Yoshida. Thank you, your honors. May it please the court, Stephen Yoshida and I represent ASI, the appellee. In Washington State, an insurance purchaser is entitled to make an election. Get a little closer to the microphone and raise it up. Yeah. Yes. In Washington State, an insurance producer is entitled to make an election to receive communications electronically. And when that election is made, the electronic communication, whether that's a bill, a renewal offer, or any communication, is treated as the equivalent, as if that same communication had been sent by regular mail. The insured who has designated and provided an email address will receive the same single renewal offer, the same single packet of insurance policy documents, only it will be sent to an email address rather than a physical home address. But it's going to be one renewal offer directed to the named insured. In this case, ASI complied with the statute by providing one single renewal offer to the named insured, and that renewal offer was provided 61 days before the expiration deadline. That renewal offer includes... What's your response to his argument that you really have to have two emails when you have a marriage? That is inconsistent. Well, there is no case law to support that. That is inconsistent with the language of the statute, and that's absolutely inconsistent with the language of the policy as well. The notice at issue or the consent that you need to receive is from a party or the party, and that is defined as, you know, any recipient of any notice or insurance policy documents. So you then have to refer to what is the notice that we are talking about here, and the notice that we're talking about here or the communication is the renewal offer. And who does the renewal offer need to go to? The renewal offer goes to the named insured. What if both Mr. and Mrs. Hughes are named insureds? It remains the same. The named insured is defined by the policy as a singular. James L. Hughes and Dena M. Hughes, they are, for the purposes of notice, they are one entity or one individual. Just like at their home address, James Hughes and Dena Hughes would receive one letter and one renewal offer. There would not be two letters, one with an envelope, you know, that stated James Hughes and a separate that stated Dena Hughes. The named insured is entitled to one renewal offer. And in this case, that one renewal offer went to the one email address that was designated by the named insured. Your response to, you know, this is kind of an odd statue, but it says that you can use electronic means only if, and then it's got this very detailed list with some things that, you know, maybe don't seem like they make a lot of sense, but they're written down with the word only in front of them and hardware and software requirements. Well, the broad purpose here is we want to make sure, or Washington State wants to make sure, that if someone is receiving their bills and their renewal offers by email that they're making, they're not going to be unwittingly signed up. But we're not bound by the purpose. We're bound by the words. And the words have what seems like a very specific, if somewhat odd requirement, but it's there. They are. They are. And they are tied up with the idea that you're providing, you're obtaining affirmative consent from the recipient of the notice. And we have affirmative consent on this case. We also have. Where did you disclose the hardware and software requirements? The hardware and software is computer and email. There is no. So it's the sentence that I quoted in the exchange with counsel before. That's what you're saying meets that and nothing else. That is correct. That disclosure, which was made available at the time of registration included, it stated you have the right to withdraw consent. You have the right to the paper copy. You need a computer and email. And essentially your consent applies to all communications in relation to this transaction. So we have compliance with that. And we absolutely have, again, not solely purpose, but strict compliance with the statute. There is affirmative consent from the named insured here. Whether the wife was directly involved or not, the named insured and the applicant here are the same person. James Hughes was not applying for a policy as James Hughes, the individual. James Hughes applied for a policy and bound ASI to the named insured. So the fact that the named insured, one of the, one of the persons listed on the declarations page as the named insured has provided that affirmative consent that binds the named insured. You address counsel's argument that you don't have sufficient evidence that he actually clicked that box because you don't have the login record and you could, in fact, click through. You could advance to the next screen without clicking the box. That is untrue. And the record before the district court was you cannot have a paperless e-policy issued by ASI. You cannot be receiving any of these communications unless you check the box, unless you go through all of those steps, which are. And where specifically in the record is the evidence that says that? It is the declaration of Kelly O'Neill and I believe it's excerpt of record 183 is the starting point. So she is a director of underwriter. She has personal knowledge. She explained not only, you know, what these pages, these web pages are, but the process and the entire process that ASI has created is essentially a safeguard to ensure that the applicant does have access to a computer, can navigate this, and is providing affirmative consent to receive bills electronically. Again, you cannot navigate through this without specifically checking the box. It has a very clear disclosure that I am agreeing to conduct this transaction electronically. Can you address this July 18th progressive email that says because you pay through your lender, no action is needed. They also receive the bill and will pay on your behalf. I mean, that's, if I received an email like that, I would just assume it's coming from my insurer. I don't have to pay. Well, a couple of points here. One, that is not a communication from the actual insurance company. The issuer of the policy is ASI. Progressive sales is the agent that sold the policy and they are not even, although they are named progressive, they're not even a captive agent. They sell policies from various different, they sell all sorts of different products, although they are called progressive. Do you dispute that they're your agent for purposes of this policy? No, they are the agent for the purposes of the policy, but they are a separate entity and the challenge or the... Right, but if they send a misleading communication acting within the scope of their agency as your agent, then you're responsible for what they do. I would disagree that this is a misleading statement and that it is a statement based on information. Is the statement true on the day it was made? Was the information conveyed in that statement true? It was not true to the extent that they had paid off their loan. Not true, it sounds misleading then. That's what misleading means. It was based on information that was provided by the insured that they had an active lien against this property and that there was an escrow account. It was based on information that was also provided by the mortgage lender themselves. But to the extent it was inaccurate, it was, in your view, the fault of the insured failing to update the information. Whether we want to call it fault or not, it was certainly... The action. It was the result of the information that was provided by the insured and also information that was provided by the mortgage lender who sent... There's a record before the district court that the mortgage lender actually sent a communication to ASI in December of 2021 stating ADAS as a second lien against this property, which suggests there must have been a first lien and there was still an escrow account. So there's no requirement under Washington law that an insurance company track the mortgage status of its insured. They base their communications and information on the information that is provided by the  And the communication that's sent to the mortgagee is essentially a safeguard to both the insured and the mortgage company. And in this case, we have a renewal offer that was made to the named insured. We have two copies of this renewal offer, which were also sent to the two mortgagees that were listed. And all of this, Your Honor, also has to be read in context. Yes, we have that July email. But if you go through all the other emails and written letters to the named insured, it states repeatedly, you know, check with your mortgage company. Make sure this information is accurate. If your payment is being made by your mortgage company, you know, check with them to make sure that it's made. So it is the it is the burden on the insured to keep track of their mortgage status. Can I ask you a question about the September 23rd email? Because this is after the policy has lapsed. Correct, correct. So on September 23rd, they are sent an email that says we attached your current policy documents. That's where you'll find your all your important policy details like your coverages, bill plan and agent information. If your policy is renewing, you'll need to make a payment, et cetera. It's identically worded to the original July email. There is no word in this email that, oh, by the way, your policy has lapsed and you have no coverage. In fact, it says the opposite. Here is your coverages. There's how is it not misleading in a violation of the CPA not to put in the email that attached is your cancellation notice. You have no coverage and instead put in statements that say that you have coverage. Why is it that not just a blatant violation of the CPA? It is certainly imperfect. But then that has to be perfect. I mean, that has to be read in context with the duty imposed by Washington law under Jackson insurance. You have a duty to read through your insurance policy documents. But can you I understand you may be right in terms of the insurance code contract arguments. You may be right on those. But the Consumer Protection Act is a little bit different because it deals with actions that are misleading or potentially misleading and can confuse consumers in a way that harm that harm them and even harm them in terms of they lose a contract action as a result. So you sent a cover email that doesn't tell them the policy is canceled. In fact, because it's worded identically to the pre payment, you know, the pre due date one, it suggests exactly the opposite. Someone who reads this is not going to know that they have a crisis on their hands, that they have no insurance coverage. It's misleading. Why is this not a violation of the CPA? It is not. It is not deceptive in the sense that the insured still has the opportunity to click on the email, read through the document and see what actually happened with the policy. And it's also not causally related in under the facts. Suppose the email said, don't worry, you have coverage. You're all set. Have a nice day. But the but the attachment says you have a cancellation. Would that still be the well, they should have clicked through. Well, I think that would certainly be more problematic for the insurance carrier if they're making an affirmative representation that is directly inconsistent with the document that and saying attached are your coverages is not an affirmative misrepresentation when you have no coverage. I don't believe it's an affirmative representation when again, when read in context with it's the same form email that comes with every single email. And it's and the burden on the insured is to click through and read over what the document actually says. And all of this is also within the context of this did not that September email did not deprive the insured of their insurance coverage. The reason that the insured lost their insurance coverage is because they had already failed to pay and the failure to pay had nothing. If he had clicked through saw the cancellation, could he have sent in the payment then and salvage the situation? He would have been he would he could have reactivated the it would not have been a strict renewal because the policies canceled, but he could get a new policy at that point. But the renewal is over because it would have been automatic. So it wouldn't have been like, well, we're not going to take you anymore. It was it was there like a safe harbor period after the deadline passes that you have to reactivate? There is no safe harbor. No safe harbor. Once the once the policy is not renewed, the policy is not renewed. You do not have coverage, but you could call in and whether we call it a reactivation, it's essentially a new insurance policy at that point. A renewal would just be a continuation of the existing because there is no existing policy. Once you fail to make the payment, it would be a new policy. But the the insureds here had all of the information. And that's a very important point is many of the arguments that are being raised by the appellants insureds in this case are in disregard of the undisputed fact that the named insured here received the renewal offer open to the email containing the renewal offer, and they didn't miss the payment. The policy did not lapse because of any confusion involving the email form of the offer. It had to do with the fact that in their separate capacity as borrowers in their relationship with a lender, there was some confusion as to whether that lender had reopened the escrow account. That was not the result of any action or inaction committed by the insurance carrier. In this case, the insurance carrier's only obligation is to provide this renewal offer. And the renewal offer was provided 61 days prior to the expiration date. There was ample time. It was very clearly a renewal offer to James Hughes and Dina Hughes, not to the mortgage company. And again, the obligation on the insured. It's very unfortunate what happened here was you need to read through your policy documents and contact your mortgage company if you have any questions. So that concludes my argument. Unless your honors have any questions. Fine. Thank you, counsel. We'll hear rebuttal now. At the time of the email that says, don't worry, I think it's a July 18th email, don't worry, it'll be paid by the mortgage company, the mortgage had already been paid off and the escrow terminated? The first mortgage had, but then they had entered into another, a second mortgage with the same lender. So when it said that the Columbia Credit Union was going to be the payor, they were the lender who they just made an arrangement with on that home equity loan. So the documents showed that their lender, their current lender was going to write that check. And then the insurance company very recklessly on July 18 sends an email out saying, your lender is paying that check. Well, either the insurance company knew that to be false or they had no idea and they were saying that anyway. He testified that he, in fact, believed that in his deposition, that he, in fact, believed that they had paid it. Yes, he testified that he understood from that email that it was being paid by someone else. And that was due to the home equity line and not due to a belief. He obviously couldn't have believed it was due to the original mortgage because that was gone. And he knew that. He did. And, in fact, after the first mortgage was gone and paid off, he did pay the renewal for that first renewal after. It was when this renewal came up that he got the email saying, hey, it's being paid by someone else. And he's like, all right. And he moved on. And is counsel correct that in the situation in September that there is no safe harbor? It would just be written as a new policy. It isn't like there isn't like a provision that says if you miss the payment, but you send in within 30 days, you'll be reactivated. I'm not aware of a safe harbor. But Mr. Hughes testified he did this over the phone and was able to apply for and get this insurance. He's got a lot of insurance policies through Progressive. And for him, had he known, he would have easily been able to make that phone call and get it remedied. Right. But it wouldn't. So even if there were a CPA violation in September, it wouldn't undo anything of what had happened. It would just be that he was deprived of the opportunity to have the new policy, which would still be but for a cause potentially of the damage that ultimately happened. Which I don't know that causation is per se required for a CPA claim. We just have to show that there was that misrepresentation, the misleading statement, which clearly there was, and then go through the rest of the hangman factors. But those issues should have gone to a jury as our position. I'm just trying to understand how the claims and it relates. So just assuming hypothetically, if there were a CPA violation as to September. But he otherwise, the Hughes's would otherwise lose as to the contract and other claims. The September 23rd CPA would not affect those others or somehow bring them back because they're just. No, we would be arguing that our damages under the CPA were the loss of a future insurance. So those don't interest. They're two separate claims, but they don't intersect between. I just want to understand the relationship between all the claims. And we tried to plead the CPA claim broadly referring to the emails that were sent as far as the misleading character of them. The July 18 in particular, and then the September email. Can you address your friend? The other side has claimed that it was Mr. Hughes's or the mortgage company's fault for not removing for the misleading July email. Can you address that? OK, so I'm confused by that claim because the insurance company didn't have to send that July 18 email. They didn't have to. So why did the insurance company decide it was appropriate to send that email? Why did they decide it was appropriate to say that the mortgage company was, in fact, paying the policy premium if they hadn't heard from the mortgage company to confirm that? Where was that information coming from? And why did they relay it to Mr. Hughes? Mr. Hughes didn't tell them that he was going to that the Columbia Credit was going to pay that. And Columbia Credit's fax, which is in the record, shows that it was a no escrow mortgage, which did not go to Mr. Hughes, but it went to Progressive. So Progressive had in its file that the mortgage was a no escrow mortgage. There's no record that Progressive reached out to Columbia. So what business did they have sending that July 18 email in the first place saying, don't worry, Columbia Credit's paying your premium? That's not Mr. Hughes' fault. Any other questions? I know my time has expired. Can I ask one question? Yes, go ahead. Opposing counsel continually referred to the named insured as the singular. What's your position on whether the named insured was one person under the policy or two? The policy doesn't clearly define it. I just glanced at it. It just says you refers to the named insured. The named insured being multiple people. I don't know how you lump them together because individual rights under the policy, homeowner's policy is an individual policy between people. So I don't know how you lump them together as an entity. But don't they, most insurance policy, typically you have a named insured. If someone else is insured, they're considered an additional insured? You have different options. You can be an additional insured for liability or loss payee for the coverage, the first party coverage. But for purposes of this, you can have multiple named insureds where they all have the same rights and obligations under the policy. Like the duties to cooperate fall to the named insureds, not necessarily to your loss payees or additional insureds. That make sense? All right. Thank you, counsel. The case just argued will be submitted. And this court for this session will stand in recess. All rise.
judges: COLLINS, LEE, Fitzwater